I don't have the little sheet here for the appellate's counsel. We're not quite sure what we heard you ask us to do. Well, we have two appellee sheets here. It did sound as if, yeah. Go ahead. You're the appellant. I represent the appellant. Todd represents the appellee. And cross-appellant. And cross-appellant. Okay, let the record reflect then. Mr. Reagan represents the appellant for the record. And Mr. Smith represents the appellee for appellee and cross-appellant. Okay, very good. Thank you. Thank you, Your Honor. Thank you. Should I stay here? Yes, you may. As appellant's counsel. Yes, yes, please. I'll wait for you to tell me. You may proceed. May it please the Court. My name is Mike Reagan, and together with Kevin Clark, C.E.O. of the Counsel Table, we represent the defendant, KPMG. There are many issues here. The briefing is very detailed and, indeed, voluminous. There's cross-appeal, and the time here at the Court is very short. So on KPMG's appeal, I intend to focus on just a couple of key concepts, which relate primarily to our appeal but which are so central to the analysis of the case that I'm going to spend my time talking about those because I think it drives and controls the analysis of the case. We're not going to reach the other issues. They're well covered in the briefs, of course, except as the Court invites me to. And we rely on our briefs for the other points. This is a federal tax malpractice claim, and therefore the rules of decision come from the tax code and the federal OQL the case is construing. Plaintiff claims that KPMG should have advised him to change the fundamental nature of his business to obtain different tax treatment of massive trading losses he incurred on his own behalf following years of massive profits. Plaintiff claims that if he had been advised to change his business from that of a trader in government securities to that of a dealer, he would have paid less overall tax in the relevant tax years. That last concept of less overall tax is very important not only to the main appeal but also for consideration of many of the issues on the plaintiff's cross-appeal. So for considering all of these issues, you have to look at what was the plaintiff's total tax picture in reality and then secondly in the hypothetical world he wishes to have constructed. Plaintiff's burden was to show in very macro terms here that if properly advised he would have paid less in taxes and secondly how much less in taxes he would have paid if he had received the advice that he claims he should have been given. Plaintiff's proof failed on both of those essential elements of the claim. He did not prove the fact of injury. He did not prove that he was damaged. That is he did not prove that he would have paid less in taxes if he had become a dealer and he also failed to prove the amount of damage. That is how much less in taxes he would have paid if he had been a dealer. So there are stark fundamental differences between the business of being a trader and the business of being a dealer. But that's not the only important issue here. The trades themselves must be examined to see if each of them qualifies for ordinary tax treatment. Now a trader, and these are terms of art by the way. These aren't referring to somebody walking on the streets saying he's a trader. These are terms of art under the tax law. A trader is unconcerned about the needs or desires of the counterparties on his trades. That is counterparties is just a large word for the people he's doing business with. He seeks to make his profits through a rise in value of what he's buying or an advantageous purchase price of the security. A dealer is in a completely different business. A dealer on dealer trades, which is something that's important, purchases securities based on actual or anticipated customer demand. He acts as a merchant, and those are words again coming from the cases, and is paid for the services of a merchant, seeking customers who will buy those securities at a price in excess of cost. His purchase and sale decisions are driven by the needs and demands of his customers and not by his speculative opinions as to what the market might do. A dealer, to be a dealer, has many essential additional functions. Under the plaintiff's own evidence, at least 10% of his sales, in addition to the actual trades the plaintiff relies on here, must be to true customers who are not other dealers. He must make a market. He must be in the market every day to service customers and their demand as opposed to Mr. Bielfeld who was out of the market for hundreds of days at a time yet not making any trades whatsoever. He must buy and sell in response to customer demands rather than to his own desires and sense of what the market may do. This case is about the differing tax treatment as either ordinary or capital of first, any speculative transactions, and second, those particular transactions of dealers which qualify under the tax code as true dealer activity. Our most important fundamental point is that not all transactions of a dealer are entitled to the favorable treatment as ordinary which the plaintiff needs from this court to succeed. I'll repeat myself, please. Not all transactions of a dealer are entitled to ordinary tax treatment. Plaintiff's claims must be found here to have failed as a matter of law under the applicable U.S. tax law. A dealer's speculative transactions which are made for his own needs and intentions on his own time and which are not driven by the demands and wishes of customers will not be given treatment as ordinary but rather will be regarded as a capital gain or loss. Becoming a dealer is not enough. Each individual trade of even a dealer must be examined to see if it is entitled to ordinary treatment. In the cases we've well established in our briefs, Stevens, Bradford, Van Teel, and Wood, all that the plaintiff did with his proof of trial was to attempt to show that he could have become a dealer with customers. He offered no evidence that his trades would have been dealer trades, that is, driven by customer demand, and he admitted that he would still have attempted to do the same speculative trades for his purposes, and when asked in his testimony what would be your intent if you were to have customers, his response was to do the same amount of buying that I did in the real world with the actual trades. The treatment of transactions as either capital or ordinary applies to both losses and gains, and taxpayers and the government can be on either side of that equation depending upon whether it's a loss or a gain and whether it's carried back, carried forward, but it's a universal concept here. And here the plaintiff seeks to prove that he could have engaged in transactions which would have resulted in losses which would have been given ordinary treatment. And for the purpose, I'll just touch on this briefly because the tax law is, I think, pretty well developed in the law, is that capital losses cannot be carried back to earlier years. Ordinary losses can be carried back. I think that the structure of the tax code here in defining what is a capital asset is somewhat important in this case. Section 1221 says that any property held by the taxpayer is a capital asset unless it falls into an exclusion. And so the taxpayer has to show that an exclusion applies. And the exclusion which the plaintiff seeks to have applied here is for property held by the taxpayer, quote, primarily for sale to customers in the ordinary course of his business. And so that's an ordinary asset getting out of the general statement of what the definition is, is property held by the taxpayer primarily for sale to customers in the ordinary course of his business. And unless the record is sufficient to show it, and this record isn't, then these are capital assets and capital transactions. Now, let's turn to this court's prior order in this case. And there the court gave the plaintiff the, quote, opportunity to attempt carrying his burden of proof of trial. And, you know, everybody here is highly experienced, and this was the reversal of the summary judgment, and the court did not decide particular questions of law or many questions of law applying to this thing, but rather said under the record that came here in summary judgment that the plaintiff's inability to cover was not to recover. It was not free from debt. And so we're going to send it back in the court's words, and they are absolutely appropriate, opportunity to attempt carrying his burden of proof of trial. And the order noted that the plaintiff argued, okay, argued the possibility of restructuring his transactions as legitimate dealer activity. So that was the plaintiff's argument which the court seized upon, which is the plaintiff says, you know, I think I can show that I can restructure these trades to make them look like legitimate dealer activity. So armed with the court's order, given that opportunity, the case went to trial, and the plaintiff made deliberate choices as to how to try the case. But those choices mean that he failed to carry his burden because he focused his case solely on the actual trades he made. There is not a word of evidence of any other trade. So he had to prove how those trades, that is the actual trades he made, would have been, quote, restructured as, quote, legitimate dealer activity. But he didn't do that. Plaintiff's proof was only that he would have been able to restructure his business to have become a dealer. And so if you want to look at dealers and traders,  he said I was a trader, but I think that I've offered enough proof to show that I'm a dealer. But that's not what we're here about today. We're not arguing about whether he could have had customers in one sense of the word, although that's an important word. We're not arguing about whether he could have necessarily become, moved from becoming a trader to a dealer. We're here to talk about the second half of the equation, which is the examination of the trades to see whether he had dealer trades, because changing his business alone is not sufficient to obtain ordinary treatment for his actual transactions. Because even a dealer gets capital treatment on his speculative transactions, that is, all of his transactions which are not proven to have been customer-driven in the ordinary course of his business under Section 1221 of the tax code. So are you saying that the approach taken by the plaintiff of focusing on actual trades, as opposed to a potential approach of saying my business, absent from getting those actual trades, could have been structured to afford a more favorable tax treatment in terms of carrybacks? I'm not, I understand the premise. I'm not sure what the court's question is. But you suggested that there was an approach taken by the plaintiff. Yes. Are you? And I'm saying that's what the approach was, that rather than coming in with proof as to what other trades would have been made or how the business otherwise would have been conducted to show that he had sufficient, legitimate dealer activity, that he said the same trades that I've been in the court system with before, those are the trades that I'm relying upon now, and those and no others. And that was the only proof. And then he didn't bring in, at that point, any customers. He talked about how he would have, could have gotten customers, but not a single customer testified and no expert testified, and nobody offered damage models as to what other dealerships looked like at that point, what other trades were going on, whether any of these other customers would have been doing trading in the market for their purposes. Well, there were experts that testified, but they assumed the trades would be identical. Exactly the point is that if this court were to take out a piece of paper and begin to calculate what the damages were, I respectfully submit the page would be blank because the experts were asked, and the foundational premise for all the experts was to assume that all of these actual trades, which the Seventh Circuit has said were speculative trading trades, assume that those would be dealer trades. But there's no proof of it. There was no proof offered. That assumption required the customers, the fictitious customers that may have existed, to request trades that were identical to the trades made by Plankton. Yes, based upon the way they chose to try the case. The way they chose to try the case was to say the only trades that were putting an issue here are the actual trades I made, and so they would have had to have brought in some kind of proof from somebody else, not from Mr. Bielfeld, that somebody else would have been willing to make those trades, that timing, those amounts, those prices, and, of course, at the same time as the actual trades, and there's not a shred of that whatsoever. May I ask another question? Absolutely. You said initially in your remarks that there were years of profitability. Yes. I think it was through 88, 84 through 88, and then in 89 or 90 there was a loss, and they were hoping to offset the loss against the gains. Is that true? Yes. If he had become a dealer, if he had operated as a dealer in 89 or 90 and been very, very successful, rather than having a loss, there would be nothing to offset. That's true. So as we evaluate what evidence was presented, why do we need to assume that he would not have been a really, really, really good dealer? In the years in which he had losses? No, in the years subsequent. Yes, yes, yes, yes, yes, in 89 or 90. Well, if he were, if you were to engage in that assumption, and I wish that you would, there would be then no losses to carry back. Because he's claiming 84 through 88 he was a good dealer and he had a lot of gains, but then in 89 or 90 all of a sudden this dealer was no longer a good dealer. And if you're looking at this trend, I guess that's where I'm struggling with the speculative nature of what would have happened in the last year that they were hoping to offset. And I, by the way, I'm not, I think you're asking me based upon the calendar years as sort of illustrative or hypothetical as opposed to concise. Correct, correct. And I have exact years over here, but I'm not going to take your time or mine to dig them out. But basically we're talking about three years of immense profits, 94 million in the next year. Then in the next three years he loses all that, he loses all that and much more. So, if I, thank you. So, the two fundamental things here, how do we put all of this into tort law? And the answer is, is that the, what we're here about are two primary concepts. Is that the plaintiff has to prove, all plaintiffs, all plaintiffs, and this plaintiff has to prove that he was actually damaged, that he was actually injured. Without that there is no wrong, there is no wrong to be remedied unless he can prove that he was actually damaged, actually injured. And secondly, he must prove, he must offer an evidence, a reasonable basis for the computation of his damages. And it doesn't have to be done with precision, we don't say that at all, but there has to be a reasonable basis of calculating damages and it cannot be speculated. In the absence of that proof, the plaintiff loses. And so the burden of proof here, the elements of proof, really drive the outcome of this case. And the lack of proof here is in two big areas. One, the actual trades, because as we've just been talking about here already, that there is no proof that anybody would have engaged in any of these actual trades with him whatsoever, or even a model from an expert as to this was going on in the market and this could be supported. We just had him saying, I know of customers, I could have gotten customers, period. And also, if I would have become a dealer, but that's not enough. And the key point on that is that the government does not permit sham transactions. You can't make yourself look like a dealer, or even be a dealer, but then say I have all these trades, which the government will know, which the tax code says are speculative, and they look at those, they look at the substance of the trades and not the window dressing that they're put on. And so the second area of proof that has failed is the additional trades. He would have to make about at least $25 billion in additional trades. That is the 10% that he would have to do with true customers. May I finish? You may. Two sentences. That he would have to make all those additional trades for dealer activity, being in the market every day, making the market, responding to customers, and there is not a word, not a number as to what that amount might be. And because of that, the damages here are utterly, completely speculative. And I come back, I always picture myself with great deference and also reality. If I were on the court, how would I be looking at this case? And if I were on the court looking at this case, in addition to the law, I would say, okay, well, let's get out a piece of paper and a pencil and see if I can figure out what the damages are, and there is no place to start. Thank you for indulging me for that extra time. Thank you, Mr. Ragan. Mr. Smith, you may respond. Thank you, Your Honors, and please support quickly in response to a couple of comments, and then I'll go into the argument that I have for this court on a very complex case, I would say. They indicate initially here to you that the fundamental nature of the business would have to have been changed. That was an argument made at trial. We completely disagreed on that aspect of this case in terms of that argument, and we went on, and I think I'll be able to show you here, how it was that he was so terribly close to being a dealer in the first place, such that there wasn't any need whatsoever to fundamentally change the nature of his business. The second thing I wanted to point out about the argument that you've just heard is its characterization of the first time we were here in this court. It was suggested that our entire approach was in some way that we would restructure all of our individual trades. It was quite clear from this court's order the first time that that was not the argument that we made, nor was it this court's understanding. At page 8 of that order, the court points out what our evidence was of proving our own case and cited to a Mr. Raby who had provided deposition testimony about our ability, that is Mr. Biefeld's ability, to gain dealer status. That's what our case was about. Could he have been a dealer and done the very transactions that developed over the years? Page 8 of the court's opinion citing to Mr. Chez's testimony who testified at trial. Chez described the steps that, and the court pointed out, the steps that the plaintiff could make that would have qualified him as a dealer much more likely than not. Page 9 of the appellate court's order observed that the IRS had explained that other brokers and dealers may well be customers for determining whether a person could be a dealer and cited to the IRS technical memorandum pointing out for our roadmap at trial that if we established elements like that through Chez and experts and through the IRS technical memo which stood as what the IRS uses as, that the very persons, the very entities that Mr. Biefeld transacted with other dealers, primary dealers, would be ones he could have set up arrangements with for customer agreements. Did he have a sales staff to help him with the transactions? Indeed he did, and I was going to get to that momentarily about how that... Then don't let me interrupt you. No, I'll get to that in just a moment, but I did want to point out the whole approach that this court recognized clearly what our claim was. The appellate court here recognized that what the plaintiff's claim was involving making his transactions, quote, involving other dealers qualify as dealer customer activity is what the court discussed at page 10. Ultimately, the court said at page 11, as clear as a bell in terms of what the issue was, not this discussion of restructuring that they seemed to hang on. They never cited what the court said at page 11. The issue in the instant case is whether the plaintiff could have conducted his transactions, the ones that he had, as a dealer if the defendant had given him proper advice, and that was our whole approach at trial. All of our evidence at trial directed itself to showing how Gary Biefeld was that close to being a dealer under the law, and certain changes in the way he was conducting his activities would have demonstrated that indeed he was. They carry a heavy burden here of JNOV, and we cited the cases with respect to that. I'm sure the court is well familiar with it, the Thacker case, where in an asbestos setting the evidence was simply that from the Illinois Supreme Court that there was a 3% possibility apparently that the air in the factory may have included the manville product, the remainder from others, and as a result, even though the court called it slight albeit evidence, that that was sufficient to deny JNOV. The Lee case, an Illinois Supreme Court decision as well, in which the standard, again, very high for this defendant, the appellant in this case, was a Korean gentleman who didn't speak English and wandered into the third rail area of the CTA to relieve himself, and the court there said, well, apparently, I should say the dissent commented, apparently blind, drunk, walking there, but nonetheless, JNOV denied because he had the wherewithal to go into an area of privacy to relieve himself, so perhaps signage would have helped him, warning of this. So the burden is quite heavy for this appellant. Gary Biefeld's business and his accounting work on behalf of both he and his company, Biefeld Company, was handled by KPMG and its predecessor, Pete Marwick, and I wanted to briefly tell you what he had available to him to respond to the court's question. Since the late 70s, KPMG had been involved in handling his accounting, both his personal transactions that they advised him to separate from his partnership that he owned 95.5 percent of, so they separated him from his partnership, which was, in fact, a dealership. That had been in existence for some time. In 1985, he began doing a great deal of work in government bonds to the point where he became well-known nationally. His credit lines were in the billions. He had over $200 billion in government securities transactions between 1985 and 1989. He did about a third of his transactions in government auctions right there at the beginning where the bonds were sold. He financed these transactions with what are called repurchase agreements, just like primary dealers. He used government securities broker terminals just like primary dealers. He had dealer time, they called it, on the federal wire transfer from 3 to 315 every afternoon where you finished up your work. Customers... Is having time enough or do you have to actually use that time? Well, and he did. He did use the time. He did, in fact, use the time. So he would be on the wire. There were long periods where no trading occurred while he was on the wire? This was in closing up the arrangements from 3 to 315 at the end of each day. So this federal wire to finish the work that had been done was only available to dealers. So he had all of these activities that he was involved in. He held securities, according to the testimony of Mr. Chez, on an average for only about three or four days, which is significant because that's the indication of dealer activity. One who trades frequently as opposed to one who would hold for purposes of investment for a lengthy period of time. Even the Stevens case that they cite talks about that there was a purchase there and they found that to be for investment because there was no... It appeared that they were buying an operation of a business that was going to be held for a while as investment and therefore characterized as investment. This short period of time is likewise looked to as dealer conduct. So I think all of those elements help support this. Now KPMG in 1985 was told in the person of Mr. Jack Williams, the partner accounting CPA by Gary Biefeld, that he had dramatically changed some of the level of his activities. And that year for the first time, in terms of government securities, that year for the first time they recorded him as a trader in government securities and did not recommend to him the yet further option of dealer. And that's where this begins because of the nature of the kinds of activities he was involved in, the level of the activity, all of the different things that he had available. At that point, we say, and the jury agreed, the jury agreed, that they had a responsibility. They violated that responsibility right then to advise him that dealer status is something we should try and pursue. And it wasn't, as I say, very far away already considering the elements that I've given you. Gary ended up, as a result, in 19... This was in Exhibit 17 from the trial. In the years involved, Gary ended up paying taxes in the 87 or 88 years. He paid taxes in 1987. He had tax on income of $41 million, even though he only had an economic gain of $2 million. The reason for that is that bonds and stocks, I suppose, are much different than other kinds of commodities. Bonds have two different streams of income. Bonds will have a difference in the change in their value, and they'll have an interest income. So he will have interest income on one side, but if the valuation drops on the other side, he's stuck with a capital loss that he can't deduct. And I recall this court acknowledging and pointing that out in the first opinion. So he ended up paying tax on $41 million, even though he had an economic gain of only $2 million in 1987. And he ended up paying tax in 88 on $25 million from his tax income, I should say, of $25 million in 1988. And he actually had an economic loss in 88 of $10 million. That was the evidence in the case. He paid $6.2 million in taxes on the government bond transactions, even though he had lost $10 million. Dealer status is a question of fact that this jury decided that Gary Biefeld would have obtained. They seem to want to argue that he was a speculative trader. Well, indeed, this court pointed out in the first decision that he can take that approach and did indeed say, yes, I was designated as a trader, but we say he was very, very close to dealer. And we actually had opinions in the case that, in my opinion, according to John Flaherty of the CPA from Cooper's Librand, who filed the amended returns to try and recover these losses, that, indeed, he was a dealer at the time. And so we – Flaherty first listed him as a trader, though, when he first filled out the 89 tax return. Yes, and this is a huge issue here because if I can just simply go to the letter of Mr. Williams on this whole issue. In 1990 – and I'll get right to the court's question or the point. In 1990, after other events of telling Gary that he had – he was – that the government was on another audit, was looking at him and calling him a dealer, telling him that. And then, finally, in 1990, saying, indeed, your transactions that he should rigorously pursue after analysis of the impact, the idea that you were in reality functioning as a dealer on many of the transactions you entered into in the years we are claiming the damage. So this is their partner saying, you should take these and go back with amended returns and say you weren't a trader. Now, this is difficult to do at this point, after the fact, to say, well, we were just kidding. We weren't a trader. We were really a dealer. Because – and to get to the court's question – if this dealer versus trader issue is not raised at the agent level, it may be very difficult to take that position at the appeals level. In any event, the credibility of the argument might be questioned by the appeals officer since it was not raised at the examination level. And the reason I point that out to the court in response to your question is, if you put on your tax return back in 1985 when he was being advised by them, I'm a trader. Counselor, you have two minutes. Instead of being told, well, we better put dealer on there, you're not doing it at that early point where you can be recognized as a dealer. When you try to come back years later on late advice, you're going to have problems, which he ended up having. They emphasized, in fact, those federal court cases which – But let me try to understand because my history is not in tax. In 89 when Flaherty prepared the tax return, he indicated he was a trader. And did that ever change for the business conducted and reported on the 89 return? He did. Flaherty, the same Flaherty, filed amended returns the following June, I believe it was. That return was – there were extensions obtained for 89 and that return was prepared in October of 90. Flaherty got it just a handful of days, I forget exactly the timing, before that filing. It had been in KPMG's hands and Mr. Biafoe had lost trust, went to Cooperson Library, John Flaherty. Flaherty did that as a trader, made a note in his record, dealer status, making – said that he should go take a look at that when he had the time. And then later on the following year, that would be June of 91, filed the amended returns going back to these years as recommended by – Including the 89 return? Yes. All right. Yes, because – Thank you for answering my question. Yes, yes, that would be true. Yes. All right, thank you. They rely on the findings in some of these federal decisions. They were all tainted by the fact of the negligence here. He was criticized for not having declared himself a dealer. Of course, he wasn't advised to. I agree with you. Thank you, Mr. Smith. Thank you. You'll have. Thank you. Thank you. Mr. Ray, you may reply. Yes. If I am destined to have a heart attack within the next five minutes, I would like to get out this sentence first. Let's hope that's not going to be the case. Thank you. Did Mr. Smith say anything about the actual transactions just now? And he didn't say a thing, and that's the key part of this case. And if I could impart nothing else to you, the mere changing your status from being a trader to a dealer, changing your business from being a trader to a dealer doesn't do a thing for you. It sort of becomes a condition preceded to some analysis under the tax law, but it doesn't win the day. You then have to show that the transactions themselves were dealer, legitimate dealer activity, that they were customer-driven trades, that they were not speculative, and he didn't say a single word about that. So, having not yet had my heart attack, I'll go back and take up some things. He talked about this letter, which we, of course, knew he would be talking about here, and he made the argument, too, that he was terribly close to being a dealer. But the point is, he wasn't, and there is an order, there is an opinion from the Seventh Circuit saying that he was a speculator in all of his glory, wherein nothing plain or simple than that. So he wasn't a dealer, even if he might have been close to it. But, again, it's irrelevant to the analysis because what we're coming in here to say is You're not saying that Seventh Circuit is binding in any way, shape, or form. Well, only to this extent, Your Honor, that, yes, those facts, okay, those facts have been conclusively determined in terms of what the actual trades were. I mean, obviously, the Yeah, but this is a tort case. It is, but it is a tax case, and it must be decided. The rules of decision, there's another layer of decision other than just tort law, which comes into this, and that's the tax bill. And so we know from Judge Bozner that, you know, as to what the, but that's been established, okay, for that narrow purpose. I'm not saying that the, and I certainly would not say that the Seventh Circuit has any greater status about these tort questions, but on the fundamental questions about whether there's any relevance at this point to this letter, there is none. I mean, we know it's here because it's a great trial piece of evidence, but it has nothing to do with the arguments that we've made to you. He talked about, you know, what the plaintiff argued before, and he says we misunderstood it, and he points to a particular part of the opinion that there is no doubt. I mean, on the same page eight that he was talking about, this court said much of the party's arguments focus on whether plaintiff's transactions could have possibly been restructured as a legitimate deal or activity. Defendant says no. Plaintiff, of course, says yes, and that's exactly the argument he just told you within the last ten minutes, that they didn't wait before, that they didn't have to restructure their transactions. And the, on page 11 of the opinion, the court says, plaintiff should be afforded an opportunity to attempt to carry his burden of proof at trial. Another part of the opinion they talk about on page 11, I misquoted that one, page 11 from the part of the opinion which was talking about Professor Lincoln, says the issue in this case, however, is whether plaintiff could have conducted his transactions as a dealer if defendant had given him proper advice. So there's been no doubt. I mean, this court understood back then that this was in part about the transactions, and clearly that's what's being brought to you now. Counsel, you have one minute. Thank you. And I am deaf in my right ear, so I didn't hear you before. I heard you very well that time. So, I don't know if there's anything else I want to tell you in a minute here. Largely, okay, we've heard about Mr. Bielfeld having to pay so much income tax in a given year. It's not our fault. It's not KPMG's fault. It's the tax law. I mean, the treatment of speculation is set up for a particular reason. We didn't set the rules. Those are the rules. And back to tort law briefly, and I will retire, and that is back to the elements. What's the structure here? The structure of the argument is that the plaintiff has not proven, because he hasn't brought in the evidence of numbers, that he was damaged. And he hasn't proven a – he has to show, he has to show evidence that there's a reasonable basis for calculation of the damages. And as the Supreme Court said recently in the Trijee case, which is another malpractice case, the juries don't possess a roving commission to find or declare damages. And that's exactly what happened here. There has to be proof. There are – the law is unwilling to substitute a speculative outcome. Thank you. You may finish. I'm done. May I ask a question? Certainly. My colleagues have to put up with me all the time, but this is my only opportunity to ask you questions directly, so please indulge me. I'd love to hear the question. I'm trying to sort out in my mind if the malpractice claim had been I was a dealer, but when they filled out my tax returns, they called me a traitor. Then we can measure the damages, correct? Yes. Same transactions. Right. Based on the same transactions. Yes. If you said not only I was a – you would have to – I was a dealer. They named me a traitor. Right. They declared me to be a traitor. And so I paid $61 million too much in taxes. If the trades themselves would also be found. Were identical. Okay. But the theory in this case, the theory in this complaint, is I was a traitor and I could have been a dealer. I could have been a dealer if they had just told me how to structure, not the transactions, but my business. Right. All right. And that's why you allege it's speculative. Yes. Because – all right. Thank you. And I hope I didn't cut you off too quickly. No, no. It's not speculative necessarily as to whether he could have achieved this status, but there is utter speculation as to what his business would have looked like, both in terms of whether he could have had people do his trades with him and what would have happened with this monstrous amount of additional trades he would have had to do every single day of the year. All right. Thank you. You've answered my question. That raised a question for me. You're saying now it is not speculative. I thought earlier in your first argument you were saying that it's even speculative whether he could have become a dealer. Well, I hedged it a bit. I mean, we don't concede that he could have become a dealer. We don't concede that. But in frankness, I mean, the real crux of this case has to do with analysis of the transactions because on that there is a complete failure proof. And under the Patrick standard for JOD, we respectfully should win because of that. Okay. No other questions? Thank you, Mr. Rader. Thank you. Mr. Smith, you have five minutes on class report. If I may respectfully suggest, you objected, my friend here objected to our use of this exhibit. I have not said a word about Grosse Appeal, and so I would respectfully suggest to the Court that he has nothing to talk about at this point. Do you like to reply to that objection? Yes, I believe the reply briefs themselves address the issues that I wanted to speak to. The damages that they suggest are speculative. I think I would like to have an opportunity to reply. Consensus of the Court, you will be able to reply. Thank you, Your Honor. I very much appreciate that. The number that we put before the jury was 61.5 million, and I wanted to point out that KPMG did aggressively contest that, including the suggestion that Coopers and Librand in the fall of 1990, when they prepared the 89 document, had put him down as a traitor. That was a point that they made. So the jury could have determined that only 87 and 88 were years in which there was fault on behalf of this defendant for a total of around 23 million, a huge drop in terms of what we were addressing before the jury. And I thought that was important to point out, because at that point we are well within the area relative. I mean, I realize it's millions, but well within the area where that was occurring, and they had spoken of Coopers and Librand's conduct in that regard. This was subject to cross-examination throughout. The transactions were there and available to be looked at by the jury. And I think, finally, I simply wanted to just quickly address the reduction that was done by the trial judge. The two tax benefit rules that I think are clearly in play should not have allowed that at all. The point of the federal tax benefit rule is that at 17.6, you first, if you reduce by what they ask it to be reduced to through Harris' testimony, takes you to 10 million. That doesn't alleviate the fact that he's receiving, if he does, the remainder of 10 million, roughly, that will be subject to tax under the tax laws. So that would take him down yet further. So the tax benefit rule, he takes a double deduction coming off of that. The other point we made in the reply in which you saw a back-and-forth about, and you eventually granted their opportunity to supply a served reply, dealt with the question of Mr. Harris' last methods reduction. What they did there that we pointed out is for 1987, he had a $16.2 million claim against KPMG. Had he not used his tax losses in that year the way he did and the way Harris pointed out that gave him a 4.9 savings, his claim for that year would have been roughly 21.1 against KPMG. So 16.2 plus the 4.9 that they now are trying to use to reduce from 17.6. That means his claim in 87 would have been 21.1. They already got a reduction on what his claim was. And now they're asking for a further reduction of that same 4.9 to reduce what the jury ultimately awarded. Our claim for damages did not include that 4.9 and could not be a part of the 17.6 is the point. It was deducted in 87 to reduce what they would have to pay. They already had the benefit of the losses in 87 reducing his tax payment. And it didn't make the claim then 21.1 but 16.2. And so they'd be getting a double deduction if you allowed Harris' rather, I have to say, he provided three different options and theories about how you might reduce this. And I think that's the reason the state tax benefit law, case law has developed, which was supported by the Randall case, serial products case in Illinois, but the Randall case at the U.S. Supreme Court level and other states, say basically that's something that's between the taxpayer and the government. It's not there to be a reducing factor. These carry forwards to be a reducing factor for the wrongdoer. And with that, there's any questions? Might I ask counsel just to recite those exhibit numbers? I think you did, but I always listen to the oral arguments on the audio tapes. If you could just recite what exhibit numbers those demonstrative exhibits represent. The exhibit at trial is 117. We just call this 117 big. So sitting in front of you is 117 big, and it shows the years. I understand. And the other exhibit is the letter? The letter goes exhibit one, and what I have today in March is just page one of exhibit one. Thank you. Okay. Very good. Thank you, counsel, for your arguments in this matter this afternoon. It will be taken under advisement.